RENDERED:  SEPTEMBER 4, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-001391-MR

PATRICIA LYNN NALLEY                                                     APPELLANT


APPEAL FROM WASHINGTON CIRCUIT COURT
v.          HONORABLE SAMUEL TODD SPALDING, JUDGE
ACTION NO. 19-CI-00044


JAMES LEON NALLEY                                                          APPELLEE


OPINION
VACATING AND REMANDING

** ** ** ** **

BEFORE:  CALDWELL, JONES, AND KRAMER, JUDGES.

KRAMER, JUDGE:  Patricia Nalley appeals the final order of the Washington

Circuit Court granting her $1,000.00 per month in maintenance for a period of five

years.  Patricia appeals both the amount and duration of the maintenance award.

Agreeing with her arguments upon review and further concluding that the basis for

the circuit court's decision is arbitrary, we vacate and remand for proceedings not inconsistent with this opinion.

The parties first married in 1980. They had three children and divorced in 1990. However, Patricia testified that the couple continued to live together after the first divorce and eventually remarried in 2001.[1] Patricia testified

---

[1] The circuit court did not take into account the time period of the first marriage, nor the time the parties lived together until they remarried. Therefore, this Court also considers only the time period that the parties were married for a second time, 2001 through 2019.

Patricia testified that the parties agreed to divorce the first time, at the suggestion of James' mother, because James was not making much money and two of their minor children, who had serious medical conditions, needed "medical cards." The circuit court included this explanation in its findings of facts and conclusions of law. In his brief, James states that "[Patricia] further alleged that the parties cohabitated during the period between 1990 and their remarriage in 2001, which Appellee denied." However, the record does not bear out this statement. James cited to page 105 in the circuit court record to support this statement, which is page two of the circuit court's finding. Therein the circuit court found that "[James] further testified the parties actually separated on two different occasions before and after their divorce."
James testified that the parties lived apart for six months and lived apart a separate time for three to six months when Patricia had "some kind of spell" and moved to Somerset, Kentucky, with the children. Otherwise, the parties lived together from 1991 until their remarriage in 2001. Similar to Patricia's testimony, James testified that the parties needed "medical cards" for two of their children and could not acquire them while they were married. From statements in the hearing made by the parties and the court, it appears that this was an acceptable means of acquiring medical cards for the children. The issues of whether any fraud on the court was committed in acquiring the first divorce; whether any act associated with this scheme was in violation of the law as fraudulent, *e.g.*, Kentucky Revised Statute (KRS) 205.8463; or whether any statute of limitation for potential criminality has passed, are not before this Court. This Court is not a finder of fact; that is the role of the circuit court. Nonetheless, we do not condone this conduct and find it very troubling. We note that:

> To permit the courts to thus be made tools for the perpetration of such frauds would bring into disrepute the whole administration of justice. They are not constructed for the purpose of aiding unconscionable persons to consummate the frauds which they may concoct; on the contrary it is the rule that courts will not permit themselves to be made the instruments by which such fraudulent schemes are carried out.

that her highest level of education was ninth grade.  She was primarily a homemaker during the marriage but occasionally worked in unskilled labor, including factory work and stripping tobacco.  Patricia also began experiencing severe mental health issues during the marriage which require ongoing therapy and medication.  By the time of the divorce proceedings, the Social Security Administration had determined that Patricia was disabled.  For his part, James was able to build a successful mechanic's shop and tow-truck business and was the breadwinner for the family.  He still owns the business; two of the parties' sons are employed with their father.

Patricia and James separated in October 2018, and Patricia filed a petition for dissolution of marriage in April 2019.  At the time, Patricia was fifty-five (55) years of age and on disability for mental health reasons.  James was sixty (60) years of age and did not testify to any mental or physical health conditions that would impair his ability to work.  The parties' children were emancipated by this point.  The parties were unable to agree on division of property and spousal maintenance for Patricia.  The circuit court conducted a hearing and issued findings of fact and conclusions of law that, in part, included that it had reviewed Patricia's medical records, her Social Security award, and considered her

*Justice v. Justice*, 310 Ky. 34, 38, 219 S.W.2d 964, 966 (1949) (quoting *Jagoe v. Jagoe*, 194 Ky. 101, 238 S.W. 185, 187 (1921)).

testimony regarding her mental health and concluded that she was "not capable of working." The circuit court awarded her $800.00 per month spousal maintenance for five years. Patricia filed a motion to alter, amend, or vacate the circuit court's findings; she argued that the $800.00 monthly maintenance award was insufficient to cover her monthly expenses and that the award should extend beyond five years. The circuit court increased the amount of the maintenance award to $1,000.00 per month but denied Patricia's motion to extend the award beyond five years' duration. Thereafter, Patricia timely appealed the circuit court's rulings.

In considering the amount and duration of a maintenance award, the circuit court must consider the factors enumerated in KRS[2] 403.200(2) which states,

> The maintenance order shall be in such amounts and for such periods of time as the court deems just, and after considering all relevant factors including:
>
> (a) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;
>
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

[2] Kentucky Revised Statute.

-4-

(c) The standard of living established during the marriage;

(d) The duration of the marriage;

(e) The age, and the physical and emotional condition of the spouse seeking maintenance; and

(f) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

While KRS 403.200 mandates considerations for the circuit courts, unfortunately "no particular [mathematical] formula has ever been held as the method for establishing maintenance." *Age v. Age*, 340 S.W.3d 88, 95 (Ky. App. 2011). An award of maintenance rests within the sound discretion of the trial court and will not be disturbed absent a showing that the findings of fact were clearly erroneous or that the court abused its discretion. *Perrine v. Christine*, 833 S.W.2d 825, 826 (Ky. 1992); CR[3] 52.01. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Sexton v. Sexton*, 125 S.W.3d 258, 272 (Ky. 2004) (citations omitted). We are mindful that, "unless absolute abuse [of discretion] is shown, the appellate court must maintain confidence in the trial court and not disturb the findings of the trial judge." *Clark v. Clark*, 782 S.W.2d 56, 60 (Ky. App. 1990).

---

[3] Kentucky Rule of Civil Procedure.

The inherent and intertwined complication we have in reviewing this matter is the lack of evidence of record to support many of the circuit court's findings of fact. In attempting to evaluate the issues on appeal, we cannot resolve them in a vacuum, particularly when the surrounding circumstances are not based on competent evidence of record. Indeed, as required by KRS 403.200 and consistent with caselaw, many factors are considered in setting maintenance. We cannot adequately review and affirm an award wherein many of the findings of fact underlying the decision are arbitrary.

One of the primary factors to review under KRS 403.200 is the property available to the party seeking maintenance and the ability of the party from whom maintenance is sought to meet his own needs. When the division of property is at issue, the classification of that property by the circuit court as marital or non-marital is a required threshold task. *Sexton*, 125 S.W.3d at 264-65. Neither Patricia nor James takes issue with the property assigned to them respectively. However, the struggle this Court has in evaluating the maintenance award is that the values the circuit court assigned to the properties/assets were either arbitrary or not properly supported by relevant evidence. Herein, for nearly most of the property divided by the court (both real and personal), the evidence to support the value given to the property by the circuit court was lacking. For example, on the parcels of real estate at issue, the PVA's value of the property was noted, as was

-6-

the price paid (even though at least two parcels were purchased over twenty years ago), and then the parties were asked their "opinion" of what they thought the property was worth. Neither party was qualified to give testimony as to the value of the real estate at issue. Moreover, the circuit court appears to have just set a value somewhere in between where the parties thought the fair market value to be. For example, in regard to the first parcel, located at 6609 Loretto Road (the property where Patricia lives), the PVA valued it at $48,000.00; James testified that he thought the property was worth $78,000.00; Patricia testified that she agreed with the PVA that the property was valued at $48,000.00; and the circuit court placed a value of $60,000.00 on it.

Regarding a house and lot located at 4515 Highway 52, Loretto, which the parties purchased in 2011, the PVA assessed it at $50,000.00; Patricia opined that it was worth $54,000.00; James thought it was worth $42,500.00; and the circuit court placed a fair market value on it of $54,000.00--despite no other testimony than that of the parties. We also note that this property was also used as rental property and was awarded to James. Yet, no rental income was attributed to him by the circuit court from this property.

Indeed, this same method was used to place value on the various parcels of real estate owned by the parties;[4] neither party was questioned or expressed qualifications that they were in any way qualified to evaluate property. The only evidence that was submitted was the PVA's value and the parties' respective, but unqualified, opinion on the value. As is well established in the law, this method was wholly insufficient to value the properties.

> To be qualified to express an opinion upon fair market value of real property, a witness, including the owner thereof, must possess "some basis for a knowledge of market values." *Robinson v. Robinson*, 569 S.W.2d [178,] 179 [Ky. App. 1978)][5] (quoting *Com. Dept. of Highways v. Fister*, 373 S.W.2d 720, 722 (Ky. 1963)). Simply stated, the mere ownership of property does not qualify a lay person to give an opinion upon market value. *Robinson*, 569 S.W.2d 178. In any event, the actual cost of improvements may be considered as evidence bearing upon fair market value but should not be the sole factor. Where the parties fail to offer sufficient proof as to fair market value of real property, we remind the family court of our Court's decision in *Robinson*:
>
> > There was simply no way in which the trial court in this action could accurately fix the value of the property which was the subject of the action with the total lack of evidence here. If the parties come to the end of their proof with grossly insufficient

---

[4] We note that two properties were awarded to James as non-marital, having been purchased after the parties' first divorce.

[5] *Robinson v. Robinson*, 569 S.W.2d 178 (Ky. App. 1978), *overruled on other grounds by Brandenburg v. Brandenburg*, 617 S.W.2d 871 (Ky. App. 1981).

> evidence on the value of the property
> involved, the trial court should either order
> this proof to be obtained, appoint his own
> experts to furnish this value, at the cost of
> the parties, or direct that the property be
> sold.

*Id.* at 180.

*Jones v. Jones*, 245 S.W.3d 815, 820 (Ky. App. 2008).

To further illustrate the point that the value assigned to the various

real estate at issue herein is not supported by acceptable evidence, we offer the

following example:

> In this case, the property interest at issue is the
> equity in the Forest Property, a non-marital asset that
> Donald received without encumbrances prior to the
> parties' marriage. As explained in a panel of this Court's
> decision, "[a]s used in KRS 403.190 in referring to
> restoration of the property of each spouse, the word
> 'property' means equity." *Robinson v. Robinson*, 569
> S.W.2d 178, 181 (Ky. App. 1978), *overruled on other
> grounds by Brandenburg*, 617 S.W.2d at 873. Here,
> while Donald introduced the exhibit from the PVA with
> the Forest Property's assessed value, Kentucky cases
> have noted that "[i]n determining the value of land . . .
> assessed value, though not conclusive, can be considered
> *in connection with other evidence of value of property*."
> *Id.* at 180 (emphasis added) (quoting *Commonwealth,
> Dep't of Highways v. Rankin*, 346 S.W.2d 714, 717 (Ky.
> 1960)). Therefore, we agree with the circuit court that
> neither party produced sufficient evidence as to the fair
> market value of the Forest Property.

> However, rather than requiring the parties to
> produce proof of the Forest Property's fair market value,
> the circuit court essentially equated the actual cost of the

parties' improvements to the Forest Property with the Forest Property's fair market value. We view this as clear error. As stated by a panel of this Court in *Jones v. Jones*, **"the actual cost of improvements may be considered as evidence bearing upon fair market value but should not be the sole factor."** 245 S.W.3d 815, 820 (Ky. App. 2008). Rather, Kentucky courts have held that if there is "grossly insufficient" evidence concerning the value of the property involved, **"the trial court should either order this proof to be obtained, appoint [its] own experts to furnish this value, at the cost of the parties, or direct that the property be sold."** *Id.* (quoting *Robinson*, 569 S.W.2d at 180).

Here, the circuit court was required to determine the Forest Property's fair market value based on substantial evidence in order to determine the parties' equity in the Forest Property, which equity was the very property interest needing categorization as marital or non-marital; ultimately, there was simply no way in which the circuit court could accurately fix the value of the property which was the subject of the action due to the lack of evidence.

*Cox v. Cox*, No. 2018-CA-001164-MR, 2019 WL 6650531, at *4 (Ky. App. Dec. 6, 2019).[6]

We also note that the value of the ongoing business was not evaluated. In sum, James received the entirety of the business, with nothing from it going to Patricia at all, despite having been married to James during eighteen years of its operation. Indeed, no value of the business itself, apart from the real estate, buildings, tools, etc., was assigned. Thus, we are left without a basis of knowing

---

[6] This case is cited for illustrative purposes only.

the value of assets assigned to James to determine how he can meet his own needs while paying maintenance to Patricia. Patricia never raised this as an issue; yet, we are left to question how maintenance can be determined when we do not know the value of the assets assigned. Moreover, the question here just begs itself: why was no portion of the value of the business acquired during the marriage assigned to Patricia? Lest this situation be taken out of the normal context, we pause to note that ordinarily

> "where the value of [non-marital] property increases after marriage due to general economic conditions, such increase is not marital property, but the opposite is true when the increase in value is a result of the joint efforts of the parties." KRS [403].190(3), however, creates a presumption that any such increase in value is marital property, and, therefore, a party asserting that he or she should receive appreciation upon a nonmarital contribution as his or her nonmarital property carries the burden of proving the portion of the increase in value attributable to the nonmarital contribution. By virtue of the KRS 403.190(3) presumption, the failure to do so will result in the increase being characterized as marital property.

> *Travis*, 59 S.W.3d at 910-11, (quoting *Goderwis v. Goderwis*, 780 S.W.2d 39, 40 (Ky. 1989)) (footnotes omitted).

*Cobane v. Cobane*, 544 S.W.3d 672, 682 (Ky. App. 2018).

Regarding income, the circuit court found that Patricia's income is $582.00 per month and that James makes nearly ten times that amount, having the reasonable ability to earn $5,000.00 per month.[7] It also found that Patricia is unable to work due to ongoing mental and physical health issues. Over the course of the eighteen-year marriage, her work history was sporadic at best; she did not graduate from high school; she has no specialized training; and she suffers from mental illness to the point of total disability. One of the parties' sons oversees Patricia's finances because she is incapable of doing so. Patricia did not receive any income-producing property in the dissolution, unlike James who received a rental property[8] and the business outright.

Regarding Patricia's expenses, the evidence of record shows that Patricia claimed monthly expenses of $3,161.25 in the financial disclosure admitted into evidence as Petitioner's Exhibit 9. The circuit court found that her expenses for household items, gas, telephone, prescriptions, and medical expenses were inflated and that $2,250.00 was a reasonable amount of monthly expenses for her. We note that James never established or offered evidence that Patricia's claimed monthly expenses of $3,161.25 were not comparable to the standard of

---

[7] James testified that his health insurance was paid through his business, but no testimony was taken as to the amount. Regardless, the circuit court did not attribute this as income to him.

[8] It does not appear that the circuit court included this rental income in James's monthly income. He testified that property is currently rented to his brother, who pays $300.00 per month.

living enjoyed during the parties' marriage or were not reasonable. The circuit court only noted one factual discrepancy in Patricia's expenses: a claimed monthly insurance payment of $196.50 that was taken out of Patricia's Social Security award. Accordingly, we are puzzled based on the evidence and testimony presented during the hearing how the circuit court came to the amount of $2,250.00. We cannot find any basis in fact in the record for the circuit court's calculation of that amount or for setting the maintenance at $1,000.00 per month.

Patricia received a vehicle that is worth thousands of dollars less than what is owed and is now responsible for the debt.[9] In contrast, James continues to work and generate income from rental property and the business entity that he received outright, *i.e.*, James was given all value of the business, including any good will or increase in value that was established during the marriage, unlike Patricia, who did not receive any value whatsoever from the business.[10] James assumed no debt from the marriage. The record shows that even considering the marital property awarded to Patricia, she will be unable to sustain her monthly expenses moving forward on a maintenance award of $1,000.00 per month limited to five years. As Patricia points out, if James is ordered to pay her an amount of

[9] Patricia's verified disclosure statement, admitted as Petitioner's Exhibit 9, indicates Patricia pays $443.75 per month toward the debt on her vehicle.

[10] There was testimony that the business was purchased when the parties were divorced the first time but continued to cohabitate as noted *supra*.

maintenance that, combined with her income from Social Security, enables her to meet her monthly expenses, he will still be left with a surplus per month after meeting his own monthly expenses. The circuit court's decision to limit the amount of maintenance to $1,000.00 per month is arbitrary considering the factors enumerated in KRS 403.200, particularly considering the gross disparity in income between the parties and, as the circuit court found, "[Patricia] is not capable of working." Hence, the circuit court's decision on the amount of maintenance must be vacated.

Patricia's next argument is that the circuit court abused its discretion by limiting the duration of her maintenance award to five years. We agree; the decision to limit the award to five years was clearly arbitrary. In the order denying Patricia's motion to extend the duration of the maintenance award, the circuit court ruled

> [t]he Court notes that after the five-year period [James] will be 65 years of age. The profession of [James] is physically demanding, and the Court finds it is not reasonable to expect [James] to continue to engage in this type of profession after the age of 65.

The circuit court's findings in regard to James's profession are clearly erroneous and arbitrary for two reasons. First, the only evidence submitted to the circuit court was testimony that James owns a mechanic's shop and tow-truck business and that two of his sons work there as well. James did not testify

-14-

regarding any physical demands of his job, the jobs he performs at the shop, his physical health, how long he plans to work, etc. In fact, his role in the business, other than being the owner, is wholly unknown based on the evidence before the circuit court (*i.e.*, it is possible that his sons perform most of the physical labor in the business, but the evidence of record simply does not allow for any sort of determination in that regard). "To review [a] judge's decision on appeal, it is important to know what facts the judge relied on in order to determine whether he has made a mistake of fact, or to even determine if he is right at law, but for the wrong facts. If a judge must choose between facts, it is clearly relevant which facts supported his opinion." *Anderson v. Johnson*, 350 S.W.3d 453, 455 (Ky. 2011). In the instant action, there were simply no facts before the circuit court regarding the specific details of James's role at his business, how physically demanding it was, or whether he, as the sole owner, would continue to draw a salary, income, or other benefits if he stopped working there. Therefore, the circuit court's decision was clearly erroneous.

Second, the circuit court clearly erred by looking five years into the future regarding James's finances. The Kentucky Supreme Court has ruled

> [t]he trial court is not required to predict with certainty what the future financial situation of the parties will be for three reasons. First, the family court cannot possibly know what that parties' financial situation will be [five] years into the future. Second, the family court is not required by statute to speculate as to the parties' future

-15-

finances. Rather, the court must look at the parties' financial positions as they are at the time the parties appear before the court, and make reasonable determinations for that point in time and going forward. Finally, KRS 403.250 provides for modifying a maintenance decree upon "a showing of changed circumstances." As such, any change in the parties' financial situation is envisioned in the maintenance modification statute.

*Weber v. Lambe*, 513 S.W.3d 912, 918 (Ky. 2017).

At no time did James testify that he planned to retire in five years. James testified that he hopes to pass the business onto his sons eventually but did not specify a timeframe for doing so. It is unknown, based on the record before us, how long James will continue to work at his business; what his plans are with regard to ownership of the business; or how either of those issues will affect his future income. It is entirely possible that, in the future, James could continue to own the business and derive income from it even if his day-to-day role is diminished. It is also possible that he may continue to derive a salary from the business even if he transfers ownership to his sons. However, neither of those scenarios is certain and both require speculation. The circuit court made its decision on duration solely on its own impression that it would be unreasonable to make James work past the age of 65, but there was no evidence whatsoever to support this finding. Contrary to the circuit court's impression, if and when James's financial circumstances change, KRS 403.250(1) enables him to seek

-16-

modification of his maintenance obligation "upon a showing of changed circumstances so substantial and continuing as to make the terms unconscionable."[11] The circuit court erred by engaging in speculation regarding James's finances five years from the date of dissolution of marriage.

For the foregoing reasons, we conclude that the bulk of the circuit court's findings of fact as they relate to a basis to make a maintenance award were arbitrary, not based on proper evidence of record, or failed to include the value of assets and other forms of income attributable to James; even *if* those findings *may* stand on remand, neither the amount nor duration of maintenance were supported by the record and were arbitrary. Accordingly, we VACATE the circuit court's findings of fact and rulings regarding the amount and duration of maintenance and REMAND for proceedings not inconsistent with this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Susan Hanrahan McCain
Springfield, Kentucky

BRIEF FOR APPELLEE:

Theodore H. Lavit
Joseph R. Stewart
Lebanon, Kentucky

---

[11] We note that there was a discussion among the circuit court and parties about whether Patricia will be eligible to collect Social Security retirement benefits through James and at what point she would be eligible to do so. If Patricia does collect additional sums of money through James's Social Security retirement, KRS 403.250 allows James to seek a modification of his monthly maintenance obligation.